UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
DIARAMA TRADING COMPANY, INC.,
d/b/a/ DTC,

                    Plaintiff,

          -against-                    01 Civ. 2950 (DAB)(DCF)
                                       <u>MEMORANDUM & ORDER</u>
J. WALTER THOMPSON U.S.A., INC.
d/b/a/ DIAMOND PROMOTION SERVICE;
HASENFELD-STEIN, INC.; KWIAT, INC.;
JULIUS KLEIN DIAMONDS, INC.; DE
BEERS CONSOLIDATED MINES, LTD.; DE
BEERS CENTENARY AG; and THE DIAMOND
TRADING CO., LTD.,

                    Defendants.
------------------------------------X
DEBORAH A. BATTS, United States District Judge.

          Plaintiff Diarama Trading Company, Inc. ("Diarama) brings an

action under the Lanham Act and New York common law alleging that

Defendants have infringed upon its federally registered "DTC"

trademark.  Defendants J. Walter Thompson, U.S.A., Inc. ("JWT"),

Hasenfeld-Stein, Inc. ("Hasenfeld"), Kwiat, Inc. ("Kwiat"), and

Julius Klein Diamonds, Inc. (" Julius Klein") (collectively

"Moving Defendants") in turn bring counter-claims seeking

cancellation of Plaintiff's trademark registration and a

declaration that they have not infringed upon Plaintiff's

trademark rights.  Presently before the Court is Moving

Defendants' joint motion for summary judgment on Plaintiff's

claims and their own counter-claims.  For the following, reasons,

Defendants' motion for summary judgment is GRANTED in its entirety.


## I.   BACKGROUND

### A.   Plaintiff's Use of the "DTC" Designation

Diarama is a New York City-based company that markets and
sells loose, polished diamonds and diamond jewelry, as well as
other precious stones, to retailers and wholesalers throughout
the United States and Caribbean.  (Declaration of Michelle
Mancino Marsh ["Marsh Decl."], Ex. 31 (Declaration of Amish
Gandhi) ¶¶ 1,5; Def. 56.1 Stmt ¶ 1; Pl. 56.1 Stmt ¶ 1).
Incorporated in February 1997, Diarama began shortly thereafter
using the letters "DTC" on all of its business materials. (Marsh
Decl., Ex. 31 ¶¶ 4, 6).  On March 2, 1998, Diarama began using
"DTC" on its jewelry, and, on March 19, 1998, applied to register
"DTC" as a trademark with the United States Patent and Trademark
Office. (Id. ¶¶ 7-8).  On November 9, 1999, Diarama was accorded
U.S. Trademark Registration Number 2,290,927 for the "DTC"
designation for use on jewelry. (Marsh Decl., Exs. 1, 31 ¶ 8).


### B.   The De Beers Diamond Business

Defendant De Beers Consolidated Mines, Ltd. ("De Beers"),
founded in South Africa in 1888, is one of the world's leading
diamond mining companies. (Declaration of S. Lynn Diamond

["Diamond Decl."] ¶ 3, Ex. B). De Beers and its affiliates, which include Defendant De Beers Centenary AG (DBCAG), currently sell about 60% of the world's rough, uncut diamonds annually. (Marsh Decl., Ex. 2 at P 02834, 02903). The diamonds are shipped to the offices of De Beers' sales arm in London, England, where they are sorted into over 5000 categories and then separated into lots called "boxes." (Id., Ex. 22 at 17; Am. Compl., Ex. B at 191). The boxes are then sold directly to a limited number of diamond dealers, cutters, and polishers who attend ten sales, called "sights", held each year at the offices of De Beers' sales arm in London, Lucerne, Switzerland, and Johannesburg, South Africa. (Id., Exs. 20 at P 2146, 22 at 15; Am. Compl., Ex. B at 190-91).

The dealers, cutters and polishers permitted to purchase boxes at the sights are known as "sightholders." They are selected by De Beers' sales arm. (Marsh Decl., Ex. 22 at 19; Def. 56.1 Stmt ¶ 3; Pl. 56.1 Stmt ¶ 3). Prior to a sight, each sightholder applies for a given quantity of rough-cut diamonds; however, De Beers ultimately determines the quantity and price of the boxes each sightholder receives. (Marsh Decl., Ex. 22 at 19; Am. Compl., Ex. B at 191). The sightholders either attend the sights themselves or purchase the boxes through brokers who attend the sights as agents of the sighthholders. (Am. Compl.,

3

Ex. B at 191; Declaration of Martin Klein ["Klein Decl."] ¶ 7).
Once a purchase is made, the diamonds are transported to the
sightholders' factories, where they are cut, polished, and then
sold to the sightholder's retail and wholesale customers
throughout the world. (Klein Decl. ¶ 7; Declaration of Sheldon
Kwiat ["Kwiat Decl."] ¶ 5; Am. Compl., Ex. B at 191).

Currently, there are 84 sightholders located around the
world, including seven in the United States. (Diamond Decl. ¶ 6).
Among the current American sightholders are Defendants Hasenfeld,
a sightholder since 1990, and Julius Klein, a sightholder since
1989. (Klein Decl. ¶ 7; Declaration of Alexander Hasenfeld
["Hasenfeld Decl."] ¶ 3).  Defendant Kwiat, meanwhile, was a
sightholder from 1998 to 2003. (Kwiat Decl. ¶ 4).

Prior to 2001, the De Beers' sales entity that officially
held the sights was known as the "Central Selling Organization."
(Marsh Decl., Exs. 18, 20, 22; Am. Compl., Ex. B; Declaration of
William Boyajian ["Boyajian Decl."], Ex. A at 136).  However,
since at least 1984, two other De Beers affiliates subsumed under
the CSO umbrella, the Diamond Trading Company (Proprietary)
Limited ("Diamond Trading Proprietary"), incorporated in South
Africa in 1934, and Defendant Diamond Trading Company Limited
("Diamond Trading Limited"), incorporated in London in 1986, both
of which have an office at 17 Charterhouse Street in London, have

dealt directly with the sightholders, invoicing them for boxes purchased at the sights and shipping the purchased boxes to them. (Declaration of James B. Swire ["Swire Decl."], Exs. K, AE, AF; Boyajian Decl., Ex. A at 136; Marsh Decl., Ex. 3 at JWT 0055; Kwiat Decl., Ex. A; Hasenfeld Decl., Ex. A; Klein Decl., Ex. A; Diamond Decl., Ex. B at JWT 0286).[1]  Moreover, since 2001, a restructured Diamond Trading Proprietary, rather than the CSO, has officially been in charge of the sights. (Deposition of Lynn S. Diamond ["Diamond Dep.] at 192-93; Diamond Decl. ¶ 8; Marsh Decl., Ex. 2 at JWT 0312-313, 0317, Ex. 3 at JWT 0055, 0701, 0834).

In addition to selling to sightholders based in the United States, De Beers has, since the 1940's, advertised and promoted its diamonds to American consumers and members of the American diamond industry. (Diamond Decl. ¶ 3, Ex. B at JWT 0286).  In the 1940's, De Beers retained the American advertising agency N.W. Ayer to develop a consumer advertising and marketing program aimed at boosting sales of diamonds and diamond jewelry in the United States. (Diamond Decl. ¶ 3, Ex. B).  In the 1970's, De Beers created the Diamond Promotion Service ("DPS"), which worked

---

[1] In addition, since the 1950's, numerous diamond and jewelry industry trade publications have identified the "Diamond Trading Company Limited," instead of or in addition to the CSO, as De Beers' "selling subsidiary" and the DeBeers entity in charge of the sights. (See Swire Decl., Exs. A-D).

with N.W. Ayer to create a trade component to De Beers American marketing efforts that would complement the already-successful consumer component. (Id. ¶ 3).

In September 1995, De Beers' Consumer Marketing Division executed a letter agreement with Defendant JWT, under which all aspects of the De Beers' advertising account, including DPS, were moved to JWT, who was engaged to replace N.W. Ayer as De Beers' U.S. advertising agency. (Diamond Decl. ¶ 4, Ex. A). The agreement specified that JWT was acting as an independent contractor rather than an agent of De Beers in the United States. (Id., Ex. A). Since assuming control of De Beers' U.S. marketing efforts, JWT has focused primarily on diamond jewelry retailers, creating advertising and point-of-sale materials such as booklets, brochures, information cards, and other material that retailers can provide to customers, as well as an extensive array of sales training services to those in the diamond and jewelry industries. (Id. ¶ 5).

C.    Pre-1997 Use of the "DTC" Acronym

Since the 1950's, various American diamond and jewelry industry publications have used the acronym "DTC" to refer to Diamond Trading Proprietary and/or the Diamond Trading Limited. For example, an article in the February 1950 issue of the

<u>National Jeweler</u> used "DTC" to refer to "the Diamond Trading Company Ltd., London, De Beers gem-selling subsidiary," and the magazine continued to use the acronym in this way until 2000. (Swire Decl., Ex B; Def. 56.1 Stmt ¶ 25; Pl. 56.1 Stmt ¶ 25). Similarly, from the early 1980's until at least 1997, two other publications, <u>Jewelers Circular-Keystone</u> and <u>The Goldsmith</u>, consistently used "DTC" to refer to the "Diamond Trading Company," which they in turn identified as the De Beers' "subsidiary in London" that held sights ten times a year and as "De Beers' London-based marketing arm." (Swire Decl., Exs. C and E).[2] Moreover, the third edition of the <u>GIA Diamond Dictionary</u>, published by the Gemological Institute of America[3] in 1993, uses

_____

[2] In addition, numerous books published in the United States before 1997 that deal specifically with the diamond trade have used "DTC" to refer to the Diamond Trading Company (Proprietary) Limited. <u>The Diamond Connection: A Manual for Investors</u>, by Anthony C. Sutton, published in 1979, defines "DTC" as "the Diamond Trading Company (Proprietary) Limited." (Def. 56.1 Stmt ¶ 21; Pl. 56.1 Stmt ¶ 21; Swire Decl., Ex. T). <u>Diamond People</u>, published by the Gemological Institute of America in 1990, uses "DTC" to refer to "the Diamond Trading Company," which is in turn described as a company incorporated in South Africa in 1934. (Swire Decl., Ex. R). <u>The World of the Diamond</u>, by Isaac Pollak, published in 1975, uses "DTC" to refer to the "Diamond Trading Company," which is described as "a corporation. . . formed in 1934" that is part of the CSO. (<u>Id.</u>, Ex. AA).

[3] The Gemological Institute of America (GIA), the world's largest institute of gemological research and learning, provides a variety of educational services to the diamond and jewelry industries. (Boyajian Decl. ¶ 2).

"DTC" to refer to the Diamond Trading Company (Proprietary) Limited. (<u>Id.</u>, Ex. O).[4]

De Beers' own publications have since the mid-1980's also consistently used "DTC" as an abbreviation for both Diamond Trading Companies. An article in the March 30, 1984 issue of the De Beer's publication <u>Optima</u> about the 50th Anniversary of the Diamond Trading Company (Proprietary) Limited refers to the latter as the "DTC." (Swire Decl., Ex. K). Similarly, between 1986 and 1996, the De Beers' quarterly publication <u>In-Sight</u>, which is circulated to members of the United States diamond and jewelry industries, published several articles in which "DTC" was used to refer to Diamond Trading Proprietary, Diamond Trading Limited, and, more generally, the "Diamond Trading Company." (Boyajian Decl., Ex. E; Diamond Decl. ¶ 11; Declaration of Matthew Runci ["Runci Decl."] ¶ 9; Marsh Decl., Ex. 15).

Since the mid-1980's, the Diamond Trading Proprietary has shipped diamonds to sightholders in the United States using packaging tape and labels containing the acronym "DTC." (Klein Decl. ¶ 7; Swire Decl., Ex. AU (Declaration of Jeffrey Fischer) ¶ 3 and Ex. A thereto; Deposition of Jeffrey Fischer ["Fischer Dep."] at 77-88, Exs. 2, 6-13). Moreover, since at least 1994,

---

[4] However, William G. Boyajian, president of the GIA has indicated that "DTC" has also been used at times "interchangeably" with CSO and De Beers. (Deposition of William Boyajian at 124).

the brokers who coordinate sight purchases for the sightholders have often referred to the Diamond Trading Limited as "DTC" in letters to the sightholders attaching invoices from Diamond Trading Limited for diamonds purchased at the sights. (Klein Decl. ¶ 7, **Ex. A**).

From 1992 through 1996, various U.S. diamond dealers published ads in diamond and jewelry trade publications circulated in the United States in which they referred to themselves as "DTC sightholders," using "DTC" to refer to the "Diamond Trading Company." (Def. 56.1 Stmt ¶ 18; Pl. 56.1 Stmt ¶ 18, Swire Decl., **Ex. BC**). However, the ads did not specify if they were referring to Diamond Trading Limited or Diamond Trading Proprietary. (Def. 56.1 Stmt ¶ 18; Pl. 56.1 Stmt ¶ 18).

D.    De Beers' "Supplier of Choice
      Initiative" and Its New "DTC" Identity

In 1999, motivated by declining stock prices and a desire to modernize its business practices, De Beers conducted a company-wide "Strategic Review" of all its business practices, from mining to marketing. (Marsh Decl., Exs. 2-4). The result was the "Supplier of Choice" (SOC) Initiative, announced in July 2000, which included four components relevant to this case. First, the "De Beers" brand identity long associated with the rough-cut diamonds sold to sightholders and the De Beers' worldwide

consumer marketing campaign was replaced by the "Diamond Trading Company," using the acronym "DTC."[5] (Marsh Decl., Ex. 2 at JWT 0318, P 03173, Ex. 3 at JKD 000024; Boyajian Dep., Ex. 7). In addition, Diamond Trading Proprietary officially replaced the CSO as De Beers' worldwide sales arm and conductor of the sights, and was restructured to include De Beers' previously separate marketing division. (Id., Ex. 2 at JWT 0313, Ex. 3 at JWT 0055, 0701, and 0834, Ex. 4 at JWT 3774; Diamond Dep. at 192-93,). Thus, Diamond Trading Proprietary took over responsibility for De Beers' engagement with JWT/DPS, overseeing all of the latter's marketing of the new "DTC" diamond brand in the United States. (Def. 56.1 Stmt ¶ 2; Pl. 56.1 Stmt ¶ 2; Diamond Decl. ¶ 8).

Finally, each former CSO sightholder that continued as a DTC sightholder after July 2001[6] was to sign a "DTC Sightholder Policy Statement," that would function as a legal contract between the sightholder and DTC under which the former agreed to abide by a set of DTC-established "best practice principles" and to devote increased effort and resources to marketing, while DTC

---

[5] The "De Beers" brand name was in turn reserved for future use with a more exclusive consumer brand of diamond. (Marsh Decl., Exs. 2, 4).

[6] As part of the SOC initiative, DTC also significantly reduced the number of sightholders eligible to do business with it. The new sightholder list announced in July 2001 did not include several well-known long-time CSO sightholders. (Marsh Decl., Ex. 2 at P 02903).

would in return provide marketing support services and materials and authorize sightholders to use the "DTC sightholder" identity to market their own products. (Marsh Decl., Ex. 2 at JWT 0318 and P 2834, Ex. 3 at JKD 000024-25, Ex. 4 at JWT 3775, and Ex. 31 ¶ 25). As part of the DTC marketing support effort, JWT, through DPS, placed ads in various U.S. diamond trade publications asking DTC sightholders to return all De Beers brand marketing materials to DPS in exchange for "DTC" marketing materials. (Am. Compl., Ex. I; Marsh Decl., Ex 14). Henceforth, Defendants Hasenfeld, Kwiat, and Julius Klein, all of whom were selected as DTC sightholders in 2001, began producing print advertising for their smooth, polished diamond products using the "DTC" designation. (Am. Compl., Ex. C; Kwiat Decl. ¶ 4; Hasenfeld Dec. ¶ 3; Deposition of Martin Klein ["Klein Dep."] at 65-66).

In conjunction with the new "DTC" identity launch, Defendant DBCAG applied to register the "DTC" acronym as a trademark in numerous countries throughout Europe, Asia, and Latin America in 2000 and 2001. (Am. Compl., Ex. H). In addition, in June 2000, attorneys for De Beers met with a representative of Diarama and offered him $1,000,000 to transfer the U.S. DTC trademark rights to De Beers, an offer he ultimately refused in November 2000. (Marsh Decl., Ex. 31 ¶¶ 18, 27). Meanwhile, in May 2000, JWT purchased and became the registrant of the "dtc.com" Internet

domain name. (Declaration of Anne Valentzas ["Valentzas Decl."] ¶¶ 3, 5, Ex. A). The dtc.com Internet website has in turn functioned as the official website of the Diamond Trading Company, featuring advertisements for the new DTC diamond brand and information about the company. (Id., Ex. C). However, at no time has JWT nor the Diamond Trading Company made any efforts to transfer, sell, or otherwise assign the domain name to a third party. (Id. ¶ 6).

E.    The Present Action

In response to the marketing of De Beers' new "DTC" diamond brand in the United States, Diarama commenced the present action in April 2001 against the Moving Defendants and Lili Diamonds Siman-Tov Bros. ("Lili Diamonds"), another Diamond Trading Company sightholder, asserting claims of (1) federal trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114, against the sightholders, (2) federal contributory trademark infringement against JWT under 15 U.S.C. § 1114(1)(b), (3) unfair competition and false designation of origin under section 43 of the Lanham Act, 15 U.S.C. § 1125(a), against all Defendants, (4) federal trademark cyberpiracy against JWT under 15 U.S.C. § 1125(d), and (5) common law trademark infringement and unfair competition against all Defendants. (Compl. ¶¶ 37-71).

Shortly thereafter, Diarama moved this court to issue a preliminary injunction temporarily enjoining Defendants from continuing to use the DTC designation in their marketing efforts in the United States.  On May 17, 2001, the Court issued a bench ruling that denied Diarama's motion, finding that Diarama had not established a substantial likelihood of success on the merits because the evidence presented suggested that Defendants could raise a "viable and good faith defense" of prior use of the DTC mark by the Diamond Trading Company. (Transcript of Proceedings held May 17, 2001 ["Tr."], at 78-81).

On August 20, 2001, Diarama filed an Amended Complaint, adding De Beers, DBCAG, and Diamond Trading Limited as Defendants to its federal trademark infringement, federal unfair competition and false designation of origin, and common law trademark infringement and unfair competition claims. (Am. Compl. ¶¶ 55-90).[7]  The Moving Defendants then each separately answered and brought counterclaims for cancellation of Diarama's registered trademark under 15 U.S.C. § 1119, and for a declaratory judgment that Diarama did not have any valid or enforceable trademark rights in the DTC designation and that they were not infringing upon Diarama's trademark. (Swire Decl., Exs. AL-AO). However, the remaining three Defendants failed to respond to the Amended

---

[7] Diarama voluntarily dismissed its claims against Lili Diamonds on June 26, 2001.

Complaint within the time period allotted by the Federal Rules of Civil Procedure, and Diarama thus moved for default judgment against DBCAG and Diamond Trading  Limited.  The Court in turn held Diarama's motion "in abeyance" and declared that, pursuant to <u>Frow v. De La Vega</u>, 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872), the liability of the Defaulting Defendants would "be determined in line and accordance with the ultimate liability of the Appearing Defendants." (<u>See</u> Memorandum and Order, dated November 12, 2002, at 11-12).

The Moving Defendants now move for summary judgment on all of Diarama's claims and their counterclaims against Diarama.


## II.  DISCUSSION

### A.  Summary Judgment Standard

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); <u>see also</u> <u>Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.</u>, 219 F.3d 104, 107 (2d Cir. 2000).  Genuine issues of material fact cannot be created by mere conclusory allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." <u>Heublein v. United States</u>,

996 F.2d 1455, 1461 (2d Cir. 1993) (citing <u>Matsushita Elec.</u>
<u>Industr. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88, 106
S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

In assessing when summary judgment should be granted, "there
must be more than a 'scintilla of evidence' in the non-movant's
favor; there must be evidence upon which a fact-finder could
reasonably find for the non-movant." <u>Id.</u> (citing <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505, 91
L.Ed.2d 202 (1986)). While a court must always "resolv[e]
ambiguities and draw[ ] reasonable inferences against the moving
party," <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir.
1986) (citing <u>Anderson</u>), the non-movant may not rely upon "mere
speculation or conjecture as to the true nature of the facts to
overcome a motion for summary judgment." <u>Id.</u> at 12. Instead,
when the moving party has documented particular facts in the
record, "the opposing party must, 'set forth specific facts
showing that there is a genuine issue for trial.'" <u>Williams v.</u>
<u>Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986) (quoting Fed.R.Civ.P.
56(e)). Establishing such facts requires going beyond the
allegations of the pleadings, as the moment has arrived " 'to put
up or shut up.'" <u>Weinstock v. Columbia University</u>, 224 F.3d 33,
41 (2d Cir. 2000) (citation omitted). Unsupported allegations in
the pleadings thus cannot create a material issue of fact. <u>Id.</u>

15

**B.    Diarama's Federal and Common Law Trademark Infringement,
       Unfair Competition and False Designation of Origin Claims**

Moving Defendants argue that they are entitled to summary

judgment on Diarama's federal and common law trademark

infringement, contributory trademark infringement, unfair

competition and false designation of origin claims because

Diamond Trading Company (Proprietary) Limited,[8] with which they

claim to be in privity, possesses "prior trade name rights in the

term DTC in the United States that are superior to those of

[Diarama]." (Memorandum of Law in Support of Defendants' Motion

for Summary Judgment ["Def. Mem."] at 10).

Moving Defendants are essentially raising the <u>jus tertii</u>

defense to trademark infringement; that is, they are relying on

the allegedly superior trademark rights of a third party to

establish their own priority of use over Diarama's rights in the

"DTC" mark.  However, the <u>jus tertii</u> defense is severely

disfavored by the federal courts, which have only entertained it

where the defendant invoking it makes a "showing of privity or

successor-in-interest status with respect to such [superior

trademark] rights." <u>Real Property Mgmt., Inc. v. Marina Bay</u>

<u>Hotel</u>, 221 U.S.P.Q. 1187, 1191 (T.T.A.P. 1984); <u>Lapinee Trade,</u>

---

[8] While Moving Defendants' memorandum of law mentions the
"Diamond Trading Company Limited," it is clear that the entity
they then describe is actually the Diamond Trading Company
(Proprietary) Limited. (<u>See</u> Def. Mem. at 2).

<u>Inc. v. Paleewong Trading Co., Inc.</u>, 687 F.Supp. 1262, 1264 (N.D.Ill. 1988) (same) (quoting <u>Real Property Mgmt.</u>), <u>aff'd</u>, 876 F.2d 106 (7th Cir. 1989); 5 J.T. McCarthy on Trademarks and Unfair Competition § 31:160 (4th ed. 2003). Thus, to be entitled to summary judgment, Moving Defendants must show indisputably that (1) the Diamond Trading Company (Proprietary) Limited acquired prior trade name rights in "DTC" superior to Diarama's subsequently acquired trademark rights, and (2) the Moving Defendants are in privity with Diamond Trading Company (Proprietary) Limited with respect to these superior rights.

### 1. <u>Prior Trade Name Rights in "DTC"</u>

It is well-established that while technical trademark or service mark use is a requisite for federal registration, prior "use of a designation in interstate or intrastate commerce in a manner analogous to trademark and service mark use" can defeat a trademark registered by a subsequent user. <u>Jimlar Corp. v. Army and Air Force Exchange Serv.</u>, 24 U.S.P.Q.2d 1216, 1221 (T.T.A.B. 1992); <u>see also</u> <u>The Jim Dandy Co. v. Martha White Foods, Inc.</u>, 458 F.2d 1397, 1400 (C.C.P.A. 1972); <u>Liqwacon Corp. v. Browning-Ferris Indust., Inc.</u>, 203 U.S.P.Q. 305, 308 (T.T.A.B. 1979); <u>Malcolm Nicol & Co., Inc. v. Witco Corp.</u>, 881 F.2d 1063, 1065 (Fed. Cir. 1989). Such "analogous" uses include "use in advertising, use as the

salient feature of a trade name, or any other manner of. . . open and public use of such nature and extent as to create, in the mind of the relevant purchasing public, an association of the designation" with the goods and services of the party claiming priority rights in the designation. <u>Jimilar</u>, 24 U.S.P.Q.2d at 1221; <u>Liqwacon</u>, 203 U.S.P.Q. at 308 (same); <u>see also</u> <u>Marthaus v. Video Duplication Serv.'s, Inc.</u>, 3 F.3d 417, 421 (Fed. Cir. 1993) ("[A] trade name lacking any independent trademark or service mark significance may bar registration of a trademark or service mark that is confusingly similar to that trade name."); 15 U.S.C. § 1052(d) (providing for the rejection of a trademark registration application that is confusingly similar to a "trade name previously used in the United States by another and not abandoned. . .").

The Moving Defendants claim analogous prior use of the "DTC" acronym as a "trade name." A "trade name" is defined under the Lanham Act as " any name used by a person to identify his or her business or vocation." 15 U.S.C. § 1127. "No particular formality of adoption or display is necessary to establish trade name identification." <u>Nat'l Cable Television Assoc., Inc. v. American Cinema Editors, Inc.</u>, 937 F.2d 1572, 1577 (Fed. Cir. 1991). "An organization need only to have used a name or acronym in a manner that identifies the company by that name or acronym to the public." <u>Id.</u> Moreover, "public identification" of a trade name may be

inferred "on the basis of indirect evidence regarding. . . use of the word or phrase in advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications," T.A.B. Syst. V. Pactel Teletrac, 77 F.3d 1372, 1375 (Fed. Cir. 1996), and third-party public use of the term in the trade and by the news media inures to the benefit of the claimant of the priority trade name rights, even if the claimant itself has not made use of the term. Nat'l Cable Television Assoc., 973 F.2d at 1577-78; American Stock Exchange, Inc. v. American Express Co., 207 U.S.P.Q. 356, 364 (T.T.A.B. 1980).

Under the foregoing standards, the Diamond Trading Company Proprietary clearly used the "DTC" acronym as a trade name in the United States in a manner sufficient to establish rights superior to Diarama's. Diamond Trading Proprietary itself used the designation on the packaging in which it shipped diamonds to sightholders in the United States, which constitutes use of a trade name in United States commerce. See Marthaus, 3 F.3d at 422 (finding that use of term on company's business forms constituted trade name use). Further, the longstanding use of the acronym to refer to Diamond Proprietary in numerous diamond industry trade publications and books on the diamond trade published and/or distributed in the U.S., in correspondence from diamond brokers to American sightholders, and in the print ads of various U.S.-based

diamond dealers clearly establishes identification of "DTC" with Diamond Trading Proprietary by the "relevant purchasing public," members of the United States diamond industry.

Diarama, however, argues that Diamond Trading Proprietary's prior use of "DTC" failed to meet three requirements for establishing superior trade name rights to the acronym. First, Diarama contends that Defendants cannot show that "DTC," as used in the ways just described, "denotes a single source" because the record establishes that the term has been associated with entities other than Diamond Trading Propriety. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ["Pl. Mem."] at 18-19 (citing Liqwacon, 203 U.S.P.Q. at 308)). Second, citing the Federal Circuit's decision T.A.B. Systems. v. Pactel Teletrac, Diarama argues that the above-cited use of the DTC trade name in articles and trade publication does not meet the "open and notorious" use requirement for establishing priority trade name rights. (Id.). Finally, Diarama contends that there is a disputed issue of fact as to whether Diamond Trading Proprietary's rights to the DTC acronym extend beyond the American rough diamond market to cover the entire diamond market and jewelry industry, including the polished diamond market in which Diarama itself does business. (Id. at 21-22).

Each of Diarama's arguments is without merit.  To begin with, while "DTC" has also been used at one time or another to refer to Diamond Trading Limited, the CSO, and De Beers, the record clearly establishes that each of these entities, as well as Diamond Trading Proprietary, is itself associated throughout the diamond trading industry with De Beers diamonds, so that DTC ultimately refers to goods from a single source, De Beers Consolidated Mines.  Second, to the extent Diarama contends that T.A.B. Systems holds that the use of a term in newspaper and trade publications cannot establish priority trade name rights, such argument represents a misreading of the T.A.B. Systems decision.  The T.A.B. court's ultimate holding that the specific press releases and news articles containing the term at issue in the case did not support the inference of public identification  was based on a lack of evidence that such materials were in fact widely distributed to members of the relevant consuming public. 77 F.3d at 1375-76.  The Court did not rule that such materials may never support an inference of public identification of a given designation with a single user. Moreover, as the record makes clear, the use of DTC as an acronym for Diamond Trading Proprietary occurred in numerous diamond trade publications consistently over a more than forty-year span, thereby undoubtedly reaching a substantial portion of the relevant purchasing public, i.e., members of the American diamond industry.

Finally, Diarama's contention that Diamond Trading Proprietary only used the "DTC" designation in the rough diamond market is simply false. It is undisputed that the aforementioned trade publications, books, and advertisements referring to Diamond Trading Proprietary as "DTC" were disseminated to members of the American diamond trading industry beyond the sightholders who purchase rough-cut diamonds. (See Def. 56.1 Stmt ¶¶ 22, 24, 26; Pl. 56.1 Stmt ¶¶ 22, 24, 26; Swire Decl., Ex. BC). Moreover, the unrebutted deposition testimony of numerous U.S. diamond jewelry manufacturers makes clear members of the American diamond and jewelry industries beyond the rough-cut market were also familiar with the pre-1997 "DTC" designation for Diamond Trading Proprietary. (Swire Decl., Exs. AW-BA).[9]

Accordingly, the Court finds that, as a matter of law, Diamond Trading Company (Proprietary) Limited used the trade name "DTC" in a manner conferring upon it rights to the "DTC" designation that are superior to the trademark rights of Diarama.

---

[9] Meanwhile, the survery conducted by Plaintiff's Expert Gary Ford, in which only a minority of U.S. diamond retailers surveyed identified the "DTC" acronym with the Diamond Trading Company (Declaration of Gary Ford, Ex. A), is irrelevant because direct evidence of the consuming public's identification of the target mark with the prior user is not necessary where, as here, public identification has already been established by indirect evidence. See T.A.B. Systems, 77 F.3d at 1375.

2.   <u>Privity between Diamond Trading Company</u>
     <u>(Propietary) Limited and Moving Defendants</u>

Both sides devote significant portions of their memorandum of law submitted in conjunction with the present motion discussing whether allegations contained in Diarama's First Amended Complaint constitute judicial admissions that Moving Defendants are in privity with Diamond Trading Proprietary with respect to the latter's right to use the DTC designation. (Def. Mem. at 18-20, Pl. Mem. at 9-10, Def. Reply at 5-7). While "[a] party's assertion of fact in a pleading is a judicial admission by which it is normally bound throughout the course of the proceeding," <u>Bellefonte Re. Ins. Co. v. Argonaut Ins. Co.</u>, 757 F.2d 523, 528 (2d Cir. 1985), "judicial admissions generally pertain to matters that a party is uniquely positioned to know and concede, as opposed to facts uniquely known or controlled by an adverse party." <u>In re MTBE Product Liability Litig.</u>, No. MDL 1358 (SAS), 2005 WL 906322, at *9 (S.D.N.Y. Apr. 20, 2005) (citing <u>Banks v. Yokemick</u>, 214 F.Supp.2d 401, 406 (S.D.N.Y. 2002)). Diarama's allegations regarding privity contained in its First Amended Complaint were made "upon information and belief," suggesting that the details of the relationship between the Moving Defendants and Diamond Trading Propriety were uniquely controlled by Defendants at the time the Amended Complaint was filed. (Am. Compl. ¶¶ 26, 42, 52).

Therefore, the Court will not deem Diarama to have admitted that Moving Defendants are in privity with Diamond Trading Propriety.

Moving Defendants contend they are in privity with Diamond Trading Proprietary in two respects. First, they claim that the 1995 letter agreement between JWT and De Beers Consumer Marketing Division under which JWT was retained to market DeBeers diamonds to diamond dealers and consumers in the U.S. was assigned to the Diamond Trading Proprietary at the time of the SOC Initiative announcement in 2000. (Def. Mem. at 19). Second, they claim that they all received written instructions from Diamond Trading Propriety in 2001 regarding marketing of the "DTC" brand name. (Id.).

Diarama meanwhile argues that the privity question is a disputed issue of fact for several reasons. First, Diarama contends that it is entirely unclear from the record whether the "Diamond Trading Company" that directed Defendants' "DTC" marketing efforts during the SOC Initiative was in fact the entity known as the Diamond Trading Company Proprietary Limited that previously used "DTC" as a trade name. (Pl. Mem. at 8). Second, Diarama notes that Moving Defendants have not provided any documentary evidence that the 1995 JWT-De Beers letter agreement was in fact assigned to the Diamond Trading Company in 2000, and, as such, there is no evidence of a written contract between JWT and Diamond Trading

Company. (Id. at 11-12). Third, JWT is an independent contractor rather than agent of or exclusive distributor for the Diamond Trading Company. (Id. at 13). Fourth, there is no evidence in the record of a contract, "written or oral," between the Sightholder Defendants and any Diamond Trading Company. (Id.). Finally, the Sightholder Defendants admittedly are not agents of any entity related to DeBeers, do not have exclusive license agreements with a Diamond Trading Company and or any other De Beers entity, and do not have written license agreements to use the term DTC in the U.S. (Id. at 13-14).

Contrary to Diarama's characterization, the fact that the Diamond Trading Company which took over the sales and marketing of De Beers diamonds as part of the SOC Initiative in 2000 is in fact simply a restructured version of Diamond Trading Proprietary is not in dispute. There is extensive unrebutted documentary and testimonial evidence in the record from people with personal knowledge of the details of the SOC Initiative stating as much. (See Diamond Dep. at 192-93; Marsh Decl., Ex. 3 at JWT 0055, 0697, and 0834, Ex. 4 at 3774). Meanwhile, Diarama simply contends, incorrectly, that Moving Defendants "provide no evidence confirming that either [Diamond Trading Limited or Diamond Trading Proprietary] is active" and "never affirmatively identified the corporate entity with which they claim to be in privity;" but

25

Diarama does not itself provide any evidence suggesting that the prior use of the "DTC" acronym was by a third Diamond Trading Company, unaffiliated with De Beers. (Pl. 56.1 Stmt ¶ 3; Pl. Mem. at 8). However, when a party moving for summary judgment "set[s] forth specific facts" supporting its motion, the opposing party's mere "conclusory allegations or denials" without supporting facts is not enough to create a genuine issue for trial. <u>Williams v. Smith</u>, 781 F.2d at 323 (citing F.R.C.P. 56(e)).

Diarama is correct that Moving Defendants have not provided evidence that they each had written contracts with the Diamond Trading Company authorizing them to use the "DTC" designation in their marketing efforts. However, a formal written agreement is not the only way to establish privity. The Black's Law Dictionary definition of privity makes no mention of a written contract, defining the term as "[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter (such as a transaction, proceeding, or piece of property); mutuality of interest." Black's Law Dictionary at 1237 (8th ed. 2004). Moreover, the court in <u>Lapinee Trade, Inc. v. Paleewong Trading Co., Inc.</u>, a leading case concerning the <u>jus tertii</u> defense to trademark infringement, requires only that the third party with the superior trademark rights "permit[] a defendant to use a trademark as part of a <u>contractual arrangement</u>."

687 F.Supp. at 1264 (emphasis added). Thus, privity may even be established through an implied-in-fact contract. See Maher v. United States, 314 F.3d 600, 603 n.1 (Fed. Cir. 2002), cert. denied, 540 U.S. 821, 124 S.Ct. 133, 157 L.Ed.2d 40 (2003).

"A contract implied in fact may result as an inference from the facts and circumstances of the case although not formally stated in words. . . and is derived from the presumed intention of the parties as indicated by their conduct. TMS Entertainment LTD v. Madison Green Entertainment Sales, Inc., No. 03 Civ. 517, 2005 WL 476663, at *5 (S.D.N.Y. Feb. 28, 2005) (citations and internal quotations omitted); Design Strategies Inc. v. Davis, 367 F.Supp.2d 630, 639 (S.D.N.Y. 2005) (same) (citing TMS Entertainment). Nevertheless, an implied-in-fact contract still "requires such elements as consideration, mutual assent, legal capacity and legal subject matter," but these can be inferred from the "specific conduct of the parties, industry custom, and course of dealing." Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 377 n.5 (2d Cir. 2000) (citations and internal quotations omitted).

In the present case, there is extensive documentary and testimonial evidence from those directly involved in and with personal knowledge of the Supplier of Choice Initiative that clearly demonstrates the relationships between the Diamond

27

Trading Company and its sightholders under the SOC constituted implied-in-fact contracts under which the sightholders were authorized to use the "DTC" acronym in their advertising.  For example, news articles, press releases, and De Beers company presentations describing the SOC initiative describe how a sightholder had to agree to comply with the DTC-created set of "best practice principles" and to develop new marketing strategies, in exchange for which the Diamond Trading Company would provide them with additional marketing resources and support services, including use of the term "DTC sightholder" in their advertising. (Marsh Decl., Exs. 2 at JWT 0317-318 and P 02834-35, 3 at JKD 000023-24 and JWT 0737-38, 4 at JWT 3774-75). Moreover, the Diamond Trading Company clearly implicitly authorized its sightholders-which included Kwiat, Julius Klein and Hasenfeld- to use the term "DTC sightholder" in their marketing when the Diamond Trading Company disseminated, through JWT/DPS- an advertisement directing the sightholders to return their "De Beers" marketing materials in exchange for "DTC" materials. (Am. Compl. Ex.I; see also Marsh Decl., Exs. ). Finally, the unrebutted testimony of JWT executive Lynn Diamond states that Diamond Trading Company- to whom the parties do not dispute JWT has been providing advertising services  since the launch of De Beers' "DTC" identity- provided JWT with guidelines

28

on how to market the new "DTC" brand. (Diamond Decl. ¶ 10, Ex. D; Def. 56.1 Stmt ¶ 2; Pl. 56.1 Stmt ¶ 2). Diarama, meanwhile, simply asserts conclusively that these guidelines do not constitute implicit authorization to JWT to use the "DTC" acronym. This unsupported assertion is clearly not enough to create a disputed issue of fact as to the existence of implied-in-fact contracts between the Diamond Trading Company and each of the Moving Defendants under which the latter were authorized to use the "DTC" designation in their marketing efforts.

Finally, Diarama does not and cannot cite to any legal authority which holds that privity cannot exist between an independent contractor and its customer. Diarama mischaracterizes the holding in Lapinee Trade because the court in that case did not rely on the exclusivity of the distribution agreement between the third-party trademark holder and the defendant in finding the former implicit authorized the latter to use its trademark, but rather on the existence of the contract itself. Thus, because, there were implicit contracts between the Diamond Trading Company and each Moving Defendant authorizing the latter's use of the former's rights in the DTC designation, the requisite authorization necessary to invoke the jus tertii defense exists.

Accordingly, having shown an absence of a material factual

dispute on both elements of the jus tertii defense, the Moving Defendants are entitled to summary judgment on Diarama's trademark infringement, unfair competition, and false designation of origin claims.

### C.   Diarama's Federal Cyberpiracy Claim

Defendants also move for summary judgment on Diarama's "Federal Trademark Cyberpiracy" claim against JWT under the Anti-cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), based on the latter's registration of the "dtc.com" domain name.  The purpose of ACPA "was to respond to concerns over the proliferation of cybersquatting- the Internet version of a land grab." <u>Lewittes v. Cohen</u>, No. 03 Civ. 189, 2004 WL 1171261, at *8 (S.D.N.Y. May 26, 2004) (internal quotations and citations omitted).  Specifically, the ACPA was designed to focus on individuals who "register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks, . . . register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, and target distinctive marks to defraud consumers, including to engage in counterfeiting activities.'" <u>Lucas Nursery v. Grosse</u>, 359 F.3d 806, 809 (6th Cir. 2004) (quoting S.Rep. No. 106-104 at 5-6).

In order to succeed on an ACPA claim, a plaintiff must prove the following elements: (1) the defendant has registered, trafficked in or used a domain name, (2) identical or confusingly similar to a mark owned by the plaintiff, (3) which was distinctive at the time of defendant's registration of the domain name, and (4) the defendant committed such acts with a bad faith intent to profit from plaintiff's mark. 15 U.S.C. §§ 1125(d)(1)(A)(i) and (ii). With respect to the "bad faith" element, the statute lists nine non-exclusive factors for a court to consider in determining whether a defendant has acted in bad faith:

> (I) the trademark or other intellectual property rights of the [defendant] in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the [defendant] or a name that is otherwise used to identify that person;
>
> (III) the [defendant's] prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the [defendant's] bona fide noncommercial or fair use of the mark in a site accessible under the domain name'
>
> (V) the [defendant's] intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of

confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)     the [defendant's] offer to transfer, sell or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the [defendant's] prior conduct indicating a pattern of such conduct;

(VII)    the [defendant's] provision of material or misleading false contact information when applying for the registration of the domain name, the [defendant's] intentional failure to maintain accurate contact information, or the [defendant's] prior conduct indicating a pattern of such conduct;

(VIII)   the [defendant's] registration or acquisition of multiple domain names which the [defendant] knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names. . ., without regard to the goods and services of the parties; and

(IX)     the extent to which the mark incorporated in the [defendant's] domain name registration is or is not distinctive and famous. . .

15 U.S.C. § 1125(d)(1)(B)(i).  In addition, ACPA contains a bad-faith "safe harbor" for a defendant who "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii); Hartog & Co. AS v. Swix.com, 136 F.Supp.2d 531, 541 (E.D. Va.

2001); <u>Chatam Int'l, Inc. v. Bodum, Inc.</u>, 157 F.Supp.2d 549, 554
(E.D. Pa. 2001).

Moving Defendants contend that JWT is entitled to summary
judgment on Diarama's ACPA claim for two reasons.  First, they
argue that the record indisputably shows JWT's registration of
the "dtc.com" domain name falls within ACPA's bad-faith safe
harbor.  (Def. Mem. at 21-22).  Second, they reason that even if
the safe harbor does not apply in the present case, a weighing of
the aforementioned factors shows that there is no genuine issue
of fact whether JWT registered the domain name without bad-faith
intent.  (<u>Id.</u> at 22-23).

Turning first to the safe harbor, JWT indisputably had
reasonable grounds to believe at the time it registered the
dtc.com domain name that its use was lawful since, as discussed
above, JWT was acting on behalf of Diamond Trading Proprietary
who had priority trade name rights in the "DTC" designation.
However, it is not clear that JWT satisfied the first prong of
the safe harbor defense because there is contradictory evidence
in the record on the question of whether JWT <u>actually</u> knew it was
purchasing the dtc.com domain name in order to promote the
Diamond Trading Proprietary's lawful trade name use of the "DTC"
designation.  At her deposition, Anne Valentzas, a senior in
JWT's New York group upon whose "personal knowledge" moving

defendants have relied to present evidence concerning the "dtc.com" domain name (see Valentzas Decl.), testified that she was not involved in the purchase of dtc.com or any other domain names for the Diamond Trading Company or De Beers and did not know for whose use the dtc.com domain name was purchased. (Deposition of Anne Valentzas ["Valentzas Dep."] at 26-28, 63).

Nevertheless the record indisputably establishes that the vast majority of factors listed in ACPA favor a finding of no bad-faith on JWT's part. Because the Diamond Trading Proprietary, on whose behalf JWT was acting when it purchased the dtc.com domain name, had superior rights to the "DTC" acronym virtue of its prior trade name use of such designation, the first three factors all weigh in favor of a no-bad faith finding. Further, the fifth through eighth factors all weigh in favor of a no-bad faith finding because there is no evidence in the record that JWT (a) registered the dtc.com domain name with the intent to divert diamond buyers from any website owned by Diarama, (b) made any offer to sell the domain name to Diarama or anyone else, (c) provided false or misleading contact information in connection with the domain name registration (see Valentzas Decl., Exs. A and B), or (d) registered multiple domain names that are confusingly similar to the marks of others. Thus, there is an ample basis for granting summary judgment in JWT's favor on

Diarama's ACPA claim. <u>See</u> Hartog, 136 F.Supp.2d at 540 (rendering judgment in defendant's favor where evidentiary record clearly showed § 1125(d)(1)(B) factors weighed in favor of a no-bad faith finding); <u>Savin Corp. v. Savin Group</u>, 68 U.S.P.Q.2d 1893, 1905 (S.D.N.Y. 2003) (granting summary judgment in defendant's favor where factor VI clearly weighed against a bad faith finding), <u>vacated on other grounds</u>, 391 F.3d 439 (2d Cir. 2004).

D.    Moving Defendants' Counterclaims

Because, as discussed in Part II.B. <u>supra</u>, Defendants are entitled to summary judgment on Diarama's claims of trademark infringement, they are obviously also entitled to a declaration that their use of the "DTC" designation to refer to the Diamond Trading Company did not infringe on any trademark rights of Diarama.  Moreover, because the prior use of a trade name confusingly similar to a registered trademark is a "valid ground for cancellation" of such trademark, <u>Herbko Int'l, Inc. v. Kappa Books, Inc.</u>, 308 F.3d 1156, 1161-62 (Fed. Cir. 2002); <u>Nat'l Cable Television Assoc.</u>, 937 F.2d at 1582; 15 U.S.C. § 1052(d), Defendants are entitled to summary judgment on their counterclaims for cancellation of Diarama's registered "DTC" trademark.

### III. CONCLUSION

For the foregoing reasons, Moving Defendants' motion for summary judgment is GRANTED in its entirety.[10] Diarama's claims against Moving Defendants for federal and common law trademark infringement, contributory trademark infringement, unfair competition, false designation of origin, and cyberpiracy/ cybersquatting are hereby DISMISSED. In addition, the Court DECLARES that Moving Defendants have not infringed upon any trademark rights of Diarama in the "DTC" designation, and ORDERS that Diarama's registration of the "DTC" trademark be cancelled. 15 U.S.C. § 1119. Finally, because Plaintiff Diarama has lost on the merits with respect to its claims against Moving Defendants, the Court also dismisses all of Diarama's claims against the three Defaulting Defendants, De Beers Consolidated Mines, Ltd., De Beers Centenary AG, and the Diamond Trading Company Limited. See Exquisite Form Indust., Inc. v. Exquisite Fabrics of London, 378 F.Supp. 403, 416 (S.D.N.Y. 1974); Lite-Up Corp. v. Sony Music Corp., No. 97 Civ. 1546, 1999 WL 436563, at *2 (S.D.N.Y. June 24, 1999).

---

[10] The time for Diarama to file a notice of appeal of this Memorandum and Order is hereby extended until 30 days after the expiration of the deadline for Diarama to retain new counsel, which is October 7, 2005. See Fed.R.App.P. 4(c); Order, dated June 8, 2005; Memo-Endorsement and Order, dated August 2, 2005.

The Clerk of Court is directed to close the docket in the above-captioned case.

SO ORDERED

DATED:     New York, New York
           September 6 , 2005

                                    _Deborah A. Batts_
                                    Deborah A. Batts
                               United States District Judge